# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 9, 2004 Session

## STATE OF TENNESSEE v. JOSEPH CHI-CHOI WONG

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-D-1879     Cheryl Blackburn, Judge**

---

**No. M2003-00504-CCA-R3-CD - Filed June 25, 2004**

---

The appellant, Joseph Chi-Choi Wong, was convicted by a jury on three counts of promoting prostitution and three counts of money laundering. As a result, he was sentenced to an effective sentence of twenty-four (24) years. In this direct appeal, the appellant challenges: (1) the trial court's decision to admit certain evidence that was found in the appellant's apartment; (2) the trial court's failure to dismiss the indictment due to the asserted unconstitutionality of the Tennessee prostitution and money laundering statutes; (3) the trial court's failure to sever the prostitution counts from the money laundering counts; (4) the trial court's failure to suppress the evidence procured from the appellant's apartment as a result of the search warrant; (5) the trial court's imposition of an excessive sentence; and (6) the trial court's failure to mitigate the appellant's sentence. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

J. Todd Faulkner, Nashville, Tennessee, for the appellant, Joseph Chi-Choi Wong.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Tammy Meade, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## BACKGROUND

In 1999, Detective Steve Ray of the Metro Police Department worked for the Vice Division. Specifically, he investigated prostitution and gambling. He saw an employment advertisement in the "Nashville Times"[1] seeking girls to work for an escort service.

Detective Ray got a female confidential informant to call the number listed in the advertisement. The confidential informant spoke with someone who identified himself as "Edward" who gave her directions to his apartment at 423 Hickory Club Drive for an interview. Detective Ray later learned that this was the appellant's residence.

On September 22, 1999, Detective Ray rented a hotel room in Nashville and had a male confidential informant call one of the advertised numbers for "Number One Absolutely the Best" to order an escort. The confidential informant requested a blond female approximately twenty-five years old with large breasts. The confidential informant was told that the price for the escort was $200 an hour if he paid in cash and $210 an hour if he paid by credit card. The confidential informant agreed to the price and the telephone call ended. A few minutes later, the confidential informant received a phone call informing him that the escort he requested was not available. After the confidential informant agreed that another escort would be suitable, he was told that someone would call him to finalize the arrangements. Shortly thereafter, the confidential informant received a telephone call from a girl who identified herself as "Destiny." She described herself as five foot three inches tall, 110 pounds with brown hair and brown eyes. The two made arrangements to meet at the hotel and the confidential informant confirmed that Destiny would "bring a ru . . . uh, protection."

When Destiny arrived at around 8:30 p.m., she immediately collected the $200 in cash from the confidential informant and then proceeded to make two phone calls. She called her driver/boyfriend to let him know that everything was alright. She also called the appellant and notified him that she had already received the money from the client. After making the phone calls, Destiny placed a condom on the bedside table and removed all of her clothing. The confidential informant was seated on the bed and wearing only a bathrobe. Destiny opened the confidential informant's robe, exposing his genitals, and straddled him.

At that point, Detective Ray entered the hotel room. Destiny identified herself as Nicole Aylward. She informed Detective Ray that she worked for a man named "Edward" and that she had received a page from the appellant about a customer that night. She understood that she was "going there [to the hotel] to have sex with somebody to get paid for it." In her purse were condoms, the $200 in cash, the appellant's telephone number, and handwritten directions to the appellant's

---

[1]A free publication full of advertisements for escort services, massage parlors, and the like.

apartment. After being arrested, Ms. Aylward called the appellant and her driver at the request of Detective Ray. She informed both of the men that the customer had decided to pay for another hour so that Detective Ray could complete his investigation.

Ms. Alyward told Detective Ray that she learned about the appellant's business and received his telephone number from a friend that worked for the appellant. She called the appellant and received an interview for the job. The interview took place at the appellant's apartment. Ms. Aylward filled out an application and additional paperwork which identified her height, weight, bra size, hair color, and eye color. The application asked whether she was bisexual, whether she was dominant or submissive, and whether she was opposed to going on dates with people of the same sex. While the application stated that there was to be no "sexual contact between the contractor and the client as this would constitute an act of prostitution and will not be tolerated by this service," the appellant explained to Ms. Aylward that this was "for his benefit" so that he would not "get in any trouble." The appellant instructed Ms. Aylward to make sure to call him when she arrived at her appointments to inform him whether she had the money from the customer. She was also to bring her own condoms and call again prior to leaving. He also instructed her to inquire if a customer was a police officer, but that if she "were to ever get caught or ever get arrested, that not to worry about it. He would help me out. He would make sure that I would get out of trouble, have an attorney, or something." The appellant explained to Ms. Aylward that the rates were $200 an hour if the customer was paying in cash and $210 an hour if the customer was paying by credit card. The appellant instructed her to bring the money or credit card slip to his apartment immediately after an appointment and to slip them under the door. If the client paid by cash, the appellant instructed the employee to keep $100 and slide $100 under the appellant's door. If the client paid by credit card, the employee was instructed to slide the credit card slip under the door. In return, the appellant would pay the employee $92.50. Ms. Aylward had "no doubt in her mind" that the appellant was running a prostitution business.

Lisa Burnette was hired by the appellant in September of 1999. She met him through her roommate, Connie, who also worked for the appellant. Ms. Burnette drove Connie on "calls" prior to the time she herself began to work for the appellant. She understood that it was a prostitution business. In fact, the appellant even told her that the business was "about sex and it was about customers [who] were paying for sex." When Ms. Burnette interviewed with the appellant, she filled out an application. The application asked if she had ever worked for an escort service, if she worked in law enforcement, if she was bi-sexual, if she would be "opposed to appointments with others of your own sex," if she was dominant, submissive, or neither, and the times she was interested in working. She also gave the appellant her height, weight, hair color, eye color, and contact information. After the interview, the appellant showed her what the "job expectations" were for the escort service. The appellant showed Ms. Burnette a certain way to take off her clothes and lay them neatly. Then, the appellant had sex with Ms. Burnette during which he told her that "the whole purpose of this is to make the other person feel good. This is how you make the other person feel good." After having sex with her, the appellant instructed Ms. Burnette to take a shower. He gave her twenty dollars for gas and told her that he would call her when he had a client.

The Metro Police procured a search warrant for the appellant's residence. The warrant was executed on September 22, 1999, by Sergeant Rob Forest. The appellant refused to answer the door to the apartment so the police were forced to use a battering ram. When the police entered the apartment, the appellant was running from his study area through the living room of the apartment in his pajamas, trying to get away from the police. The appellant was extremely uncooperative and had to be physically restrained during the search of the premises. He even refused to wear clothes other than pajamas to the police station upon his arrest.

Upon Sergeant Forest's entry, he noticed that the appellant had an office set up in his apartment with a desk, five phone lines, caller ID boxes, credit card machines and stacks of very detailed records. There were boxes of index cards containing information on particular women. The cards contained a physical description as well as sexual and racial preferences. Specifically, the cards noted whether the woman was willing to have sex with two or three people at a time, a person of the same sex, engage in golden showers[2], oral, or "greek"[3] sex. There were also boxes of index cards containing customer information. They identified the customer's name, phone number, and location where they were to meet the girl from the escort service. The police also discovered five or six years worth of "Nashville Times" magazines and a daily ledger that was used to keep track of employees' work schedules, customers and telephone numbers as well as locations, length of time, and amount of money for each transaction.

While executing the search warrant, Sergeant Forest answered three calls to the appellant's apartment. The callers identified themselves as previous customers. Each of the callers was very descriptive as to the type of sex they wished to have with an escort from the appellant's service.

When Sergeant Forest discovered that there were multiple phone lines coming into the appellant's apartment, he learned that one of the phone lines was in the name "Ultimate Designs," a business registered to the appellant. According to the Articles of Incorporation, Ultimate Designs was a clothing business. However, the telephone number registered to Ultimate Designs was the same number used for the escort service. The tax return for Ultimate Designs indicated gross sales of $198 from April of 1999 to July of 1999. The appellant's bank statements, however, revealed deposits of over $19,000 for this time period. Some of the remaining phone lines were held in the name of GEIC, Incorporated, another business registered to the appellant.

The police also recovered a resident alien card, a Vanderbilt University identification card, a social security card, a British passport, and a Hong Kong passport at the appellant's apartment.

The appellant was originally indicted on five counts of promoting prostitution and three counts of money laundering. Prior to trial, the State dismissed two of the counts of the indictment charging promotion of prostitution.

---

[2]Sexual acts involving urination.

[3]"Greek" is a slang term for anal sex.

At the trial, the court heard testimony from Detective Ray, Sergeant Forest, Ms. Burnette, Ms. Aylward, Wai Lee, a Chinese interpreter who deciphered the appellant's handwriting on some of the index cards found at the apartment,[4] the publisher of the "Nashville Times," a representative from the bank where the appellant held an account in the name of "Ultimate Designs," and a representative from Discover Financial Services where the appellant had an account in the name of CD (Couture Design), Inc.

At the conclusion of the evidence, the jury returned guilty verdicts on three counts of promoting prostitution and three counts of money laundering.

At a sentencing hearing held in November of 2002, the trial court sentenced the appellant to two years on each of the three counts of promoting prostitution and eleven years on the three remaining charges of money laundering. The trial court ordered the sentences on promoting prostitution to run concurrently. However, the trial court ordered two of the sentences on money laundering to run concurrent to each other but consecutive to the prostitution charges. The remaining money laundering conviction was ordered to run consecutive to all other charges. As a result of the manner of service of the sentence, the appellant received an effective twenty-four year sentence.

On appeal, the appellant challenges: (1) the trial court's decision to admit certain evidence that was found in the appellant's apartment; (2) the trial court's failure to dismiss the indictment due to the unconstitutionality of the Tennessee prostitution and money laundering statutes; (3) the trial court's failure to sever the prostitution counts from the money laundering counts; (4) the trial court's failure to suppress the evidence procured from the appellant's apartment as a result of the search warrant; (5) the trial court's imposition of an excessive sentence; and (6) the trial court's failure to mitigate the appellant's sentence.

Motion to Sever

The appellant challenges the trial court's denial of the motion to sever the prostitution offenses from the money laundering offenses. Specifically, he argues that there was no common scheme or plan with respect to the promotion of prostitution charges and money laundering charges and that a joint trial on these charges was "highly prejudicial." The State counters that because there is no transcript of the hearing on the motion to sever in the record, this court is unable to adequately address this issue and, in any event, the trial court properly denied the motion to sever.

A trial judge's decision with respect to a motion for severance of offenses is one entrusted to the sound discretion of the judge and will not be reversed on appeal absent an abuse of that discretion. State v. Shirley, 6 S.W.3d 243, 245 (Tenn. 1999). Additionally, "a trial court's refusal to sever offenses will be reversed only when 'the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice for the party

---

[4] Wai Lee was introduced as an expert in Chinese interpretation. He testified that the writing on the applications and index cards described very explicit sexual acts involving mouths, hands, private parts, and orgasms.

complaining.'" Shirley, 6 S.W.3d at 247 (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)). The Tennessee Supreme Court has opined that

> because the trial court's decision of whether to consolidate offenses is determined from the evidence presented at the hearing, appellate courts should usually only look to that evidence, along with the trial court's findings of fact and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses.

Spicer v. State, 12 S.W.3d 438, 445 (Tenn. 2000).

Tennessee Rule of Criminal Procedure 14(b)(1) governs severance of offenses. That rule provides:

> [i]f two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b) the defendant shall have a right to severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon trial of the others.

Tenn. R. Crim. P. 14(b)(1). A trial court may not deny a severance pursuant to Rule 14(b)(1) unless it concludes "from the evidence and arguments presented at the hearing that: (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of each offense is relevant to some material issue in the trial of the other offenses; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect admission of the evidence would have on the defendant." Spicer, 12 S.W.3d at 445 (internal citations omitted). Furthermore, "a defendant has an absolute right to sever offenses that are only of the same or similar character." Id. at 443.

There are three types of common scheme or plan evidence recognized in Tennessee: (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes: (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction. Id. at 248.

The "primary inquiry into whether a severance should have been granted under Rule 14 is whether the evidence of one crime would be admissible in the trial of the other if the two counts of indictment had been severed." Id. at 247 (quoting State v. Burchfield, 664 S.W.2d 284, 286 (Tenn. 1984)). However, Tennessee Rule of Evidence 404(b) excludes evidence of "other crimes, wrongs, or acts" committed by the defendant when offered only to show the defendant's propensity to commit those "crimes, wrongs, or acts" to ensure a defendant receives a fair trial. When offenses alleged to be parts of a common scheme or plan are otherwise relevant to a material issue at trial, however, then Rule 404 will not bar their admissibility into evidence. See Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980).

Turning to the case herein, we note that on February 2, 2001, the trial court held an evidentiary hearing on several pre-trial motions including a motion to dismiss the indictment, a motion to suppress evidence, and the motion to sever. As pointed out by the State, there is no transcript of this hearing in the record on appeal. There is, however, an extensive order from the trial court detailing the facts presented and reciting the various findings of fact and conclusions of law made by the court in denying the motion. According to footnotes in the order that cite the transcript of the preliminary hearing, the facts relied upon by the trial court appear to have primarily come from the transcript of the preliminary hearing. Despite the lack of a transcript, the record does contain the exhibits from the hearing. Those exhibits include the transcript from the preliminary hearing as well as several recorded telephone conversations between the confidential informant and the appellant, the confidential informant and Ms. Aylward, and Ms. Aylward and the appellant. Thus, despite a less than desirable record on appeal, we are nevertheless able to address the propriety of the trial court's denial of the motion to sever.

In the order denying the motion to sever, the trial court found that the offenses for which the appellant was indicted constituted a "larger, continuing plan or conspiracy" due to the fact that the court was "presented with an indictment based on factual scenarios in which the offenses relating to the prostitution counts encompass the underlying criminal conduct, which invokes the money laundering statute." Further, the trial court found that some of the offenses could also be looked at as part of the "same criminal transaction." In so doing, the trial court found that "it must rely on proof in association with the promotion of prostitution offenses when assessing whether a violation of the money laundering statute has occurred for purposes of an analysis under Rule 404(b)" and vice versa. The trial court found that it was necessary to look at all of the facts to assess the appellant's intent. Thus, the trial court found that evidence of each offense was relevant and material to proof of the other. Further, the trial court found that the evidence of each offense was not outweighed by the danger of unfair prejudice.

In other words, the trial court found that the evidence necessary to prove the prostitution and money laundering charges is so inextricably linked that both offenses should be considered simultaneously. We cannot conclude that the trial court abused its discretion in denying the motion to sever the offenses. The facts at trial indicated that the indictment resulted from a three to four month investigation in which confidential informants were used to not only apply for employment with the appellant, but procure an "escort" through his service that was ultimately paid $200 in exchange for sexual activity. Proof of the money laundering activities necessitates proof of the prostitution activities and vice versa. We hold that the trial court did not apply an incorrect legal standard, or reach a decision which is against logic or reasoning that caused an injustice for the party complaining and, therefore, affirm the trial court's denial of the motion to sever. This issue is without merit.

Motion to Suppress

The appellant argues on appeal that all of the evidence seized from his apartment pursuant to a search warrant should have been suppressed because the affidavit in support of the search

warrant lacked probable cause because it included material misrepresentations of fact. Specifically, he claims there are "no facts asserted in the affidavit which would permit an impartial magistrate to conclude that . . . [the appellant] was promoting prostitution" and that the affidavit contained a material misrepresentation of fact. The State argues that the trial court correctly refused to suppress the evidence seized because the search warrant was valid and supported by probable cause.

At the outset we note that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "The application of the law to the facts found by the trial court, however, is a question of law which this Court reviews de novo." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

We further observe that an affidavit establishing probable cause is an indispensable prerequisite to the issuance of a search warrant. See, e.g., Tenn. Code. Ann. § 40-6-103; Tenn. R. Crim. P. 41(c); State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998); State v. Moon, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992). Such probable cause "must appear in the affidavit [itself] and judicial review of the existence of probable cause will not include looking to other evidence provided to or known by the issuing magistrate or possessed by the affiant." Moon, 841 S.W.2d at 338; see also Henning, 975 S.W.2d at 295. To sufficiently make a showing of probable cause, an affidavit "must set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched." State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993). However, a decision regarding the existence of probable cause requires that the affidavit contain "more than mere conclusory allegations by the affiant." State v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999); see also Moon, 841 S.W.2d at 338.

Furthermore, when, as the appellant in the case herein claims, "probable cause for a search is based upon information from a confidential informant, there must be a showing in the affidavit of both (1) the informant's basis of knowledge and (2) his or her veracity." State v. Powell, 53 S.W.3d 258, 262 (Tenn. Crim. App. 2000); see also State v. Jacumin, 778 S.W.2d 430, 432, 435-36 (Tenn. 1989) (utilizing the standard set out in Spinelli v. United States, 393 U.S. 410 (1969) and Aguilar v. Texas, 378 U.S. 108 (1964)).[5] To sufficiently make such showings, the affidavit must include facts permitting "the magistrate to determine (1) whether the informant had a basis for his information that a certain person had been, was, or would be involved in criminal conduct or that evidence of crime would be found at a certain place" and (2) whether the informant is inherently credible or "the reliability of his information on the particular occasion." Moon, 841 S.W.2d at 338. Again, the courts have stressed that conclusory statements absent supportive detail will not suffice

---

[5]In Illinois v. Gates, 462 U.S. 213 (1983), the United States Supreme Court abandoned the Aguilar-Spinelli two-pronged test for evaluating the sufficiency of an affidavit involving a confidential informant. Gates, 462 U.S. at 238. However, the Tennessee Supreme Court subsequently concluded that Aguilar-Spinelli properly applied "provide[s] a more appropriate structure for probable cause inquiries incident to the issuance of a search warrant . . . [and] is more in keeping with the specific requirement of Article 1, Section 7 of the Tennessee Constitution that a search warrant not issue 'without evidence of the fact committed.'" Jacumin, 778 S.W.2d at 436.

to establish these requirements. See, e.g., Id. at 339. However, "independent police corroboration" may compensate for such deficiencies. See Jacumin, 778 S.W.2d at 436; Moon, 841 S.W.2d at 340.

With these guidelines in mind, we turn to the affidavit submitted herein in support of the search warrant. The pertinent portions of this affidavit provide as follows:

> On May 25, 1999, your affiant met with "C.I. One"[6] who agreed to call the phone number 366-0390, listed in the classified ad above [for the appellant's escort service], and apply for employment. "C.I. One" called the phone number 366-0390 and made an appointment to be interviewed by "Edward" on May 26, 1999 at 423 Hickory Club Drive.
> On May 26, 1999, your affiant and members of the vice division met with "C.I. One" who did agree to wear an electronic transmitter while inside 423 Hickory Club Drive. "C.I. One" knocked on the front door of 423 Hickory Club Drive and was greeted by a male oriental, who identified himself as "Edward." "C.I. One entered 423 Hickory Club Drive and below is a summary of the events that occurred:
> (1) "Edward" required "C.I. One" to fill out a form. This form asked for a physical description and what sex acts "C.I. One" would perform with customers (domination, submission, or bi-sexual)/ After completing this form "C.I. One" had to sign it.
> . . . .
> On September 22, 1999, your affiant conducted a prostitution investigation at the "Econo Lodge" located at 2460 Music Valley Drive, Davidson County. At 1905 hours "C.I. Two" placed a telephone call, under the direction of your affiant, to 615-731-1020 (listed to GEIC), located at 423 Hickory Club Drive, in which a female escort was ordered. "C.I. Two" described the male who was to arrange for the escort as an "oriental." The escort agreed to come for one hour at a cost of $200 and bring condoms.
> . . . .
> On July 23, 1999, the Vice Division received a complaint from Lt. Terry Frizzell of the Hendersonville Police Department. Lt. Frizzell forwarded an investigative report on escort services operating in the Nashville and Hendersonville areas. The investigative report was in reference to Heather Hutcheson. During the course of this investigation officers were advised that a subject by the name of Edward owns several prostitution businesses in Nashville. The investigators were supplied with the phone number of "Edward," this number being 731-6001. A records check with Nashville Electric Service reflects 731-6001 as being listed to Joseph C. Wong at the address 423 Hickory Club Drive.

An affidavit that is sufficient on its face may only be impeached by showing that it contains "(1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause," or "(2) a false statement, essential to the establishment of probable cause,

---

[6] "C.I." was the term used in the affidavit for confidential informant.

recklessly made." State v. Little, 560 S.W.2d 403, 407 (Tenn. 1978); see also Franks v. Delaware, 438 U.S. 154, 155-56 (1978). When the warrant is valid on its face, it may only be attacked when the appellant establishes that it was procured through perjury or coercion. State v. Cannon, 634 S.W.2d 648, 650 (Tenn. Crim. App. 1982). Allegations of negligence or innocent mistakes are not sufficient to invalidate the warrant. Franks, 438 U.S. at 171. The appellant must show that the reckless statements were necessary to the finding of probable cause in order to obtain relief. Id. at 155-56; see also State v. Smith, 867 S.W.2d 343, 350 (Tenn. Crim. App. 1993). In addition, the appellant has the burden of proving the allegation of perjury or reckless disregard by a preponderance of the evidence. See Franks, 438 U.S. at 156.

The appellant complains on appeal that the affidavit contains several material misrepresentations of fact. Specifically, the appellant claims that the "only evidence that Edward was arguably engaging in promoting prostitution was that the form that 'C.I. One' filled out 'asked for a physical description of what sex acts C.I. One would perform with customers'" and that this is a material misrepresentation of fact because the form specifically forbade sexual contact and any acts of prostitution. Next, the appellant argues that there was a material misrepresentation in the affidavit that "Destiny" agreed to bring condoms because "Destiny" agreed to bring "protection" and did not mention condoms. Lastly, the appellant claims that the affidavit was based on an "investigative report" from the Hendersonville Police Department and that the "unnamed source in the investigative report" is unreliable and therefore could not be used to form the basis for the affidavit.

We conclude that the affidavit presented to the magistrate was adequately supported by probable cause as it demonstrates the basis of knowledge and veracity of the informant and clearly sets out the events that led to the illegal prostitution activity. Further, we conclude that there was no material misrepresentation of fact contained within the affidavit as to the application form, the statements made by "Destiny" or the investigative report that led to the investigation. The affidavit clearly states that the informant "did agree to wear an electronic transmitter while inside 423 Hickory Club Drive" and that while inside, the informant was required to fill out a form asking what "sex acts" the informant would perform including whether the informant was dominant, submissive, or bi-sexual. The affidavit accurately reflects the content of the application. While there was a problem with the transmitter that prohibited a clear recording, the officers were able to hear the majority of the interview. The affidavit also states that the officers recorded the conversation between a confidential informant and "Destiny" in which she agreed to "bring a ru . . .uh, protection." We cannot conclude that the slight nuance between the term "condom" and "protection" in the context of the situation rises to the level of a material misrepresentation of fact. Furthermore, the language of the affidavit shows that both the initial transaction with "C.I. One" and the transaction with "Destiny" were monitored by Officer Ray. The affidavit also established that both informants had provided the police officers with reliable information which led to numerous prostitution, drug, and gambling arrests. Finally, with respect to the information provided by the "investigative report," the affidavit indicates that Officer Ray followed up on the information contained within the report by verifying that the phone number alleged to be that of a prostitution business owned by "Edward" was registered to the appellant. Based upon these facts, we conclude that the reliability of the informant's

information was adequately established and the wording of the affidavit neither misled nor misrepresented any facts. The evidence does not preponderate against the trial court's denial of the motion to suppress. This issue is without merit.

<u>Items Obtained From Search Warrant as Evidence</u>

The appellant also complains on appeal that the trial court erred in allowing the State to introduce into evidence documents seized from his apartment as a result of the search warrant into evidence because the items constituted hearsay. Specifically, the appellant challenges the introduction of the index cards, job applications, and notes that were kept on calendars, envelopes and ledgers. The State counters that the evidence was not "offered for the truth asserted within the documents" but rather as "circumstantial evidence that the defendant was operating a prostitution business out of his apartment."

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A statement can be an oral or written assertion. Tenn. R. Evid. 801(a)(1). A hearsay statement is not admissible unless it is shown to be admissible via an exception contained in the rules of evidence or otherwise by law. <u>See</u> Tenn. R. Evid. 802. The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court. <u>See</u> <u>State v. Stinnett</u>, 958 S.W.2d 329, 331 (Tenn. 1997). We will not reverse the ruling of the trial court absent a showing that this discretion has been abused. <u>See</u> <u>id.</u>

In the case herein, when the search warrant was executed, the police seized stacks of records from the appellant's apartment. Included in those records were hundreds of job applications from prospective escorts, boxes of index cards containing specific information on each escort, daily ledgers that kept track of customers, work schedules, and information on each transaction, bank records, credit card slips, and stacks of "Nashville Times" magazines. The trial court overruled the appellant's objection to the introduction of the evidence as hearsay.

We conclude that the trial court did not abuse its discretion in admitting the evidence. The documents were not introduced to prove the truth of the matters asserted within the documents. They were introduced as circumstantial evidence to show the type of records that a prostitution business would keep and that the appellant was, in fact, operating a prostitution business from his residence. This issue is without merit.

<u>Constitutionality of Tennessee's Prostitution and Money Laundering Statutes</u>

Next, the appellant argues that the trial court erred in failing to dismiss the indictments because the Tennessee prostitution and money laundering statutes, Tennessee Code Annotated sections 39-13-512(5) and 39-14-903(b)(1) are unconstitutionally vague and overbroad. Specifically, he claims that the prostitution statute is unconstitutional because it "gives no guidelines on how to define sexual activity other than to say sexual relations, which is a tautology" and that there are

"multiple situations which could be interpreted as 'sexual activity' but are legal." Further, the appellant claims that the money laundering statute is unconstitutional because "by its nature it applies to every felony under state law" and "makes the use of money under any context of a knowing violation of any felony a separate and distinct offense" which "makes it impossible for a person to know what is or what is not a crime with respect to money laundering." The State asserts that the statutes in question are constitutional.

The appellant has challenged the constitutionality of a statute, thus the general principles of statutory construction apply. Appellate courts are charged with upholding the constitutionality of statutes wherever possible. State v. Lyons, 802 S.W.2d 590, 592 (Tenn. 1990). In other words, we are required to indulge every presumption and resolve every doubt in favor of the constitutionality of the statute when reviewing a statute for a possible constitutional infirmity. Lyons, 802 S.W.2d at 592.

### A. Tennessee's Prostitution Statute

### I. Vagueness

Generally, the language of a penal statute must be clear and concise to give adequate warning so that individuals might avoid the prohibited conduct. See State v. Boyd, 925 S.W.2d 237, 242-43 (Tenn. Crim. App. 1995). A statute is void for vagueness if it is not "sufficiently precise to put an individual on notice of prohibited activities." State v. Thomas, 635 S.W.2d 114, 116 (Tenn. 1982); see also State v. Wilkins, 655 S.W.2d 914, 915 (Tenn. 1983). A criminal statute "shall be construed according to the fair import of [its] terms" when determining if it is vague. Tenn. Code Ann. § 39-11-104. "Due process requires that a statute provide 'fair warning' and prohibits holding an individual criminally liable for conduct that a person of common intelligence would not have reasonably understood to be proscribed." State v. Burkhart, 58 S.W.3d 694, 697 (Tenn. 2001) (citing Grayned v. City of Rockford, 408 U.S. 104 (1972)).

Nevertheless, the Tennessee Supreme Court has noted that "absolute precision in drafting prohibitory legislation is not required since prosecution could then easily be evaded by schemes and devices." Wilkins, 655 S.W.2d at 916; see also Burkhart, 58 S.W.3d at 697. To determine whether a statute is unconstitutionally vague, a court should consider whether the statute's prohibitions are not clearly defined and are thus susceptible to different interpretations regarding that which the statute actually proscribes. State v. Whitehead, 43 S.W.3d 921, 928 (Tenn. Crim. App. 2000). Therefore, a statute is not unconstitutionally vague "'which by orderly processes of litigation can be rendered sufficiently definite and certain for purposes of judicial decision.'" Wilkins, 655 S.W.2d at 916 (quoting Donathan v. McMinn County, 213 S.W.2d 173, 176 (1948)).

The appellant argues that the prostitution statute as applied to his situation is vague and therefore unconstitutional in that "the only alleged act of prostitution was that of Destiny," whose conduct was nearly identical to the conduct present in State v. Boyd, where the "court held that the prostitution statute was too vague to put these young women on notice that their conduct was

illegal." Specifically, as applied to his situation, the appellant complains that "since the statute fails in any measurable way to define what sexual activity is, his independent contractors and the defendant are subject to arrest based on the subjective opinion of any police officer." Thus, he complains that he could have been arrested for prostitution for merely operating a legal escort business.

Tennessee Code Annotation section 39-13-512(5) defines prostitution, in pertinent part, as "engaging in, or offering to engage in, sexual activity as a business." "Sexual activity" is defined as "any sexual relations including homosexual sexual relations." Tenn. Code Ann. § 39-13-512(6).

In State v. Boyd, 925 S.W.2d 237 (Tenn. Crim. App. 1995), relied upon heavily by the appellant, this Court reversed the convictions of two female "dancers" for prostitution but declined to interpret the word "prostitution" in the Tennessee prostitution statute as requiring any sexual penetration. The issue in Boyd was whether the prostitution statute gave adequate warning of what activities or actions were prohibited under the guise of "sexual relations." In Boyd, the two female defendants were employees of an escort service and had gone to a hotel room with an undercover police officer. Id. at 241. There, they removed each other's clothing and began to touch each other's buttocks. Id. One defendant placed her face "near" the other's genital area and later proceeded to "suck" the officer's finger. Id. On appeal, the defendants argued that the evidence was insufficient to convict them of prostitution and that the Tennessee prostitution statute was void for vagueness. This Court summarily rejected that argument, but found that the statute did not prohibit the conduct in question, stating

> [w]e emphasize that we do not find Tennessee's prostitution statute to be unconstitutionally vague. The statute remains enforceable. We do conclude that the statutory language does not clearly prohibit the conduct of the defendants in the case sub judice.

Id. at 244.

The conduct in the case herein clearly involved putative sexual activity. The confidential informant called the appellant and requested an escort. The appellant, in turn, called Destiny to arrange the meeting. Destiny called the informant, arranged the meeting, and agreed to bring protection. When she arrived at the hotel room, she took off all her clothing and straddled the genitals of the informant. The undisputed evidence also indicated that the women hired by the appellant were expected to, and did, engage in sexual activity with the appellant's customers. In addition to the conduct of Ms. Aywlard at the hotel, Ms. Burnette testified that the appellant told her at her interview the business was about sex. Further, Ms. Burnette had sex with the appellant so that he could explain "what [her] job expectations were." The evidence seized from the appellant's apartment also indicated that sexual activity was taking place. The records maintained by the appellant detailed each escort's sexual preferences including whether they would engage in anal sex, golden showers, dominant or submissive sexual behavior and participate with another person of the same sex. A person of common intelligence could easily discern that the acts shown by the evidence

herein constituted the prohibited form of sexual activity as contemplated by the statute. See Burkhart, 58 S.W.3d at 697. We conclude that the prostitution statute is not unconstitutionally vague as applied to the appellant because the statute adequately describes the prohibited conduct.

## II. Overbreadth

The appellant next argues that the prostitution statute is overbroad in that "sexual activity" is subject to many interpretations. The State counters that the statute is not unconstitutionally overbroad.

"'Overbreadth' is a judicially created doctrine designed to prevent the chilling of protected expression. The doctrine of overbreadth derives from the recognition that an unconstitutional restriction of expression may deter protected speech by parties not before the court and thereby escape judicial review." 16A Am. Jur. 2d Constitutional Law § 411 (2003). A statute may be challenged as overbroad when it reaches a substantial amount of constitutionally protected conduct. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494 (1982); Burkhart, 58 S.W.3d at 679. A statute may be invalid on its face if it inhibits the exercise of First Amendment rights and "if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" Burkhart, 58 S.W.3d at 679. To maintain an overbreadth challenge, the appellant must first show that the statute challenged involves constitutionally protected conduct. Id. If the statute reaches a substantial amount of constitutionally protected conduct, a defendant must then "demonstrate from the text of the law and actual fact that there are a substantial number of instances where the law cannot be applied constitutionally." Id. (quoting Lyons, 802 S.W.2d at 593). Further, the United States Supreme Court has "cautioned that the doctrine of overbreadth is 'strong medicine' to be used 'sparingly and only as a last resort.'" State v. Lakatos, 900 S.W.2d 699, 701 (Tenn. Crim. App. 1994) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973)).

Prostitution is not constitutionally protected conduct. See Ellwest Stereo Theater, Inc. v. Bill Boner, 718 F. Supp. 1553, 1561-62 (M.D. Tenn. 1989). The statutes, therefore, do not reach a substantial amount of constitutionally protected conduct. The appellant alleges, however, that Tennessee Code Annotated section 39-13-512 violates the First Amendment of the United States Constitution because "associations of persons for economic purposes are protected." To bolster his argument, the appellant claims that sexual activity can be construed by some to include protected conduct such as escort services, nude dancing and modeling, and erotic massage. As a result, he argues the statute is overbroad. While the First Amendment does protect associations of persons for economic purposes, it does so only when the underlying association comports with the law. We see no proof by the appellant that a substantial number of instances exist where the law cannot be applied constitutionally. Furthermore, the statute does not impede constitutionally protected conduct. This issue is without merit.

B. Tennessee's Money Laundering Statute

The appellant argues that Tennessee Code Annotated section 39-14-903(b)(1) is unconstitutional because it is vague and overbroad. Specifically, he claims that the money laundering statute is unconstitutional because it applies to every felony under state law and requires no specific <u>mens</u> <u>rea</u>. The State argues that the statute is constitutional because it specifically describes the prohibited conduct and does not infringe upon constitutionally protected conduct.

Tennessee Code Annotated section 39-14-903(b)(1) provides that "[i]t is an offense to knowingly use proceeds derived directly or indirectly from a specified unlawful activity with the intent to promote, in whole or in part, the carrying on of a specified unlawful activity." Tenn. Code Ann. § 39-14-903(b)(1).

The appellant complains that the statute is vague and overbroad "because by its nature it applies to every felony under state law" and the "criminal intent of money laundering needs not be a specific intent of knowing that the property or proceeds were derived from a specific unlawful activity but the State only needs to prove that the defendant knew that the property or proceeds were derived from 'some form of criminal activity.'" The language of a penal statute must be clear and concise to give adequate warning so that individuals might avoid the prohibited conduct. See <u>Boyd</u>, 925 S.W.2d at 242-43. The money laundering statute is "sufficiently precise to put an individual on notice of prohibited activities." <u>Thomas</u>, 635 S.W.2d at 116; <u>see also</u> <u>Wilkins</u>, 655 S.W.2d at 915. We determine that the statute's prohibitions are clearly defined and are thus not susceptible to different interpretations regarding that which the statute actually proscribes. <u>Whitehead</u>, 43 S.W.3d at 928. The statute does not allow a person to be convicted of money laundering merely for committing the felony of promoting prostitution; it requires the separate act of using the proceeds from the promotion of prostitution to further promote that business. The statute is also not void for vagueness because it applies to the proceeds of <u>any</u> unlawful activity. A reading of the statute leads to the conclusion that a person would understand any financial transaction made with what he knows are the proceeds from unlawful activity or in an attempt to conceal the proceeds from unlawful activity is money laundering. Thus, we determine that the statute is not void for vagueness. <u>See</u> <u>State v. Price</u>, 124 S.W.3d 135 (Tenn. Crim. App. 2003) (concluding that Tennessee Money Laundering statute is not unconstitutional as exemption for proceeds derived directly or indirectly from criminal acts violating the gambling statutes was supported by a rational basis, as required for equal protection purposes). Finally, the money laundering statute is not overbroad because the appellant has failed to show that the statute challenged involves constitutionally protected conduct. <u>Burkhart</u>, 58 S.W.3d at 679.

Sentencing

Finally, the appellant challenges the sentence imposed by the trial court. Specifically, he complains that the sentence is excessive and that the trial court "erred in failing to apply the mitigating factor that the defendant's criminal conduct neither caused not threatened serious bodily injury. The State contends that the trial court considered the applicable sentencing principles and

the relevant facts and circumstances surrounding the crime committed and that the trial court's decision should be affirmed.

"When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169.

In balancing these concerns, a trial court should start at the presumptive sentence, enhance the sentence within the range for existing enhancement factors, and then reduce the sentence within the range for existing mitigating factors. Tenn. Code Ann. § 40-35-210(e). No particular weight for each factor is prescribed by the statute. See State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App. 1995). The weight given to each factor is left to the discretion of the trial court as long as it comports with the sentencing principles and purposes of our code and as long as its findings are supported by the record. Id.

Turning more specifically to the facts of this case, the appellant was convicted of three counts of promoting prostitution and three counts of money laundering. Because promoting prostitution is a Class E felony, and the appellant is a Range I Standard Offender, the range of punishment is "not less than one (1) nor more than two (2) years." Tenn. Code Ann. § 40-35-112(a)(5). Because money laundering is a Class B felony, and the appellant is a Range I Standard Offender, the range of punishment is "not less than eight (8) nor more than twelve (12) years." Tenn. Code Ann. § 40-35-112(a)(2). Furthermore, the presumptive sentence would be the minimum sentence in each range if there are no enhancing and mitigating factors present. Tenn. Code Ann. § 40-35-210(c).

In the case herein, the appellant filed a motion prior to sentencing in which he proposed the application of the following mitigating factors: (1) the defendant's criminal conduct neither caused nor threatened any serious bodily injury, Tenn. Code Ann. § 40-35-113(1); (2) the defendant has no prior criminal record; (3) the defendant, because of youth or old age, lacked substantial judgment in committing the offense, Tenn. Code Ann. § 40-35-113(6); and (4) the defendant was motivated by a desire to provide necessities for the defendant's family or the defendant's self, Tenn. Code Ann. § 40-35-113(7). Further, the State filed a motion prior to sentencing in which the following enhancement factors were proposed: (1) the defendant was a leader in the commission of an offense involving two (2) or more criminal actors, Tenn. Code Ann. § 40-35-114(3); and (2) the defendant

failed to comply with the conditions of bond, as he continued to operate his business after his arrest for the charges herein.

In imposing the appellant's sentence, the trial court found the existence of one enhancement factor, that the appellant had an extensive history of criminal behavior. Tenn. Code Ann. § 40-35-114(2). The trial court gave this factor substantial weight. The trial court did not find that any of the mitigating factors proposed by the appellant applied to reduce his sentence. The appellant does not challenge the trial court's application of the enhancement factor, but only the trial court's refusal to apply the mitigating factor that the appellant's conduct neither caused nor threatened serious bodily injury. Because the record demonstrates that the trial court properly considered the relevant sentencing principles, we apply the presumption that the determination made by the trial court was correct.

## A.  Mitigating Factor (1)

The appellant first complains, without citation to authority, that the trial court erred in failing to apply the mitigating factor that the appellant's conduct neither caused nor threatened serious bodily injury. Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). By failing to cite any authority for his argument, we conclude that the appellant has waived this issue. Moreover, we cannot say that the trial court erred in apparently concluding that sending women to the hotel rooms of total strangers to engage in sexual activities is not entirely free from the threat of serious bodily injury.

## B.  Consecutive Sentence

Finally, the appellant claims that his sentence is excessive. Specifically, he seems to argue that "the maximum sentence on the counts of promoting prostitution and the almost maximum sentence on the counts of money laundering" were imposed in violation of the sentencing considerations of Tennessee Code Annotated section 40-35-103. The State contends that the records supports the sentence imposed by the trial court.

The trial court sentenced the appellant to two years on each of the three counts of promoting prostitution and eleven years on the three remaining convictions of money laundering. The trial court ordered the sentences on promoting prostitution to run concurrently. However, the trial court ordered two of the convictions on money laundering to run concurrent to each other but consecutive to the prostitution sentences. The remaining money laundering conviction was ordered to run consecutive to all other sentences. As a result of the manner of service of the sentence, the appellant received an effective twenty-four year sentence.

We interpret the appellant's argument as complaining that the trial court erred in imposing consecutive sentences because he does not complain that the trial court improperly applied the enhancement factor, but merely that the sentences were "excessive."

-17-

A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. That statute provides, in pertinent part:

> (a) If a defendant is convicted of more than one (1) criminal offense, the court shall order sentences to run consecutively or concurrently as provided by the criteria in this section.
> (b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:
> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood; . . . .

Tenn. Code Ann. 40-35-115. Further, "consecutive sentences cannot be imposed unless the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). The decision to impose concurrent or consecutive sentences, however, is a matter entrusted to the sound discretion of the trial court. State v. Blouvet, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997).

The overall sentencing guidelines are found at Tennessee Code Annotated section 40-35-103. They provide the following guidance for trial courts in making sentencing determinations:

> (1) Sentences involving confinement should be based on the following considerations:
> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant;
> (2) The sentence imposed should be no greater than that deserved for the offense committed;
> (3) Inequalities in sentences that are unrelated to a purpose of this chapter should be avoided;
> (4) The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed;
> (5) The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed. The length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence; . . . .

Tenn. Code Ann. § 40-35-103.

In imposing the appellant's sentence, the trial court held as follows:

> Now with regard to whether or not these are going to be running concurrent or consecutive, . . . . Looking at multiple convictions, I'm going to find that he is a professional criminal who has knowingly devoted himself to criminal acts as a major source of his livelihood. He is in every sense of the word a professional criminal. Now I guess you could also argue he has a record of criminal activity that is extensive, but I'm just not going to use that, so having found that he is eligible for multiple convictions, I do not have to really look at whether or not the aggregate term reasonably relates to the severity of the offenses, and whether it is necessary to protect the public from further serious criminal conduct by the defendant; however, I think that is a pretty good guide to look at, and that is in determining what, if any, of these sentences running concurrent or consecutive, I need to look at whether or not he has done anything that would justify me not running all of these sentences consecutive. I guess the thing that is just so outstanding to the Court is, one, how pervasive this problem is in Davidson County; how important it is to show deterrence to those similarly situated, and clearly, from Sergeant Forest's testimony, they watch these cases very closely in terms of what is going to happen, and looking at State vs. Hooper, which is found at 29 S.W.3d, at page 1, the Court give me some guidance in terms of the types of cases that this might be important in, and that has to do with whether or not there has been substantial publicity, whether this is someone who is in here for their financial gain, or whether this is just once in a lifetime kind of situation. Every possible need for deterrence is begging out in this particular case . . . .

Implicit in the trial court's determination of the sentence is a consideration of the sentencing considerations embodied in Tennessee Code Annotated section 40-35-103.

We determine that the record amply supports a finding that the sentences were properly ordered to run consecutively. The appellant made his living as a professional criminal. The record indicates that the appellant engaged in the business of promoting prostitution for several years and that he used the proceeds of his illegal enterprise to sustain his lifestyle. Further, the appellant continued to engage in his business after being arrested for the charges for which he was ultimately convicted. The trial court did not abuse its discretion in ordering the appellant to serve an effective twenty-four year sentence. Accordingly, the appellant's sentence is affirmed.

-19-

<u>Conclusion</u>

After a thorough review of the record, we conclude that there is no reversible error. Accordingly, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE